LANE, receiver, *v.* THE MACON AND ATLANTIC RAILWAY
COMPANY *et al.*, and *vice versa.*

1. While it is undoubtedly within the discretion of the court, upon
proper cause shown, to extend the time for filing exceptions to a
master's report beyond the period limited by an order previously
passed, no such extension of time can be demanded as a matter of
right; and accordingly it was error, after the expiration of the
time fixed by such order, to allow a party, by whom such excep-
tions had been duly filed, to then file other exceptions which were
not, by amplification or otherwise, merely amendatory of those
first filed, but of a new and entirely distinct character,—no reason
whatever being presented why the extension of time should be
granted, nor any excuse offered for the failure to file the new ex-
ceptions at the proper time, and it appearing also that the court,
in passing upon the matter, did not attempt any exercise of its
discretion. Especially was the allowance of the additional excep-
tions erroneous, when it resulted in a re-reference to the master
and a serious protraction of the litigation.

2. Where cars were delivered to a corporation under a duly recorded
lease contract, with provision therein for final sale and for a reser-
vation of title in the lessor until the cars were fully paid for, and
the receiver of a railway company (to which these cars had been
delivered by the lessee, or its successor in possession) took posses-
sion of the cars after certain partial payments upon the lease con-
tract had been made, and the court, upon a proper application by
the owner of the cars, refused either to adopt and complete that
contract or to return the cars to such owner, but on the contrary
ordered the receiver to retain and use them, though finally direct-
ing their return to the owner, the latter became entitled to a rea-
sonable rent for the cars, covering the time they were used by the
receiver, as a part of the expenses of the receiver's administra-
tion of the railway company's property; and the amount of such
rent should be arrived at upon the basis of the actual value of the
cars for rent, and not upon the basis of what the receiver actually
received as mileage from other roads for the use of the cars.

3. The above is true in the present case on general principles; but
even were this not so, certainly a trustee of the bondholders of
the railway company, who resisted the return of the cars and par-
ticipated in procuring the order refusing to restore them to the
owner, is estopped from denying that the rental of the cars is an
expense of the receivership prior in dignity to the lien of the
mortgage securing the payment of the bonds.

4. Eliminating the exceptions to the master's report which the court
improperly allowed to be filed, the equities between the contend-

ing parties, so far as relates to the remaining matters of dispute, are, under the peculiar facts of this case (all of which cannot be conveniently summarized in a head-note), as follows:

(a) The proceeds of the sale of the property of the railway company are chargeable with the claim for rental due to the owner of the cars from the time they went into the railway company's possession until their final return, the amount of rent to be ascertained as above indicated.

(b) The owner of the cars is also entitled, out of such proceeds, to the cost of extra repairs on the cars, for depreciation over and above that caused by ordinary wear and tear; but is not entitled to anything for depreciation in the cars resulting from their usual and proper use.

(c) The owner of the cars is also entitled, out of such proceeds, to the expenses paid by him and which were incurred in returning the cars to the place where the court ordered them to be delivered to him.

(d) Interest should be allowed on the above claims from the date of such delivery, and they should rank in dignity prior to the lien of the bondholders upon the fund derived from the sale of the property of the railway company.

(e) The above claims of the car-owner should be credited with all the payments made upon the lease contract; and for the general balance thus found due such car-owner, he should have a decree, of the rank and dignity above stated, payable out of the fund above mentioned.

August 16, 1895. Argued at the last term.

Exceptions to master's report. Before Judge GRIGGS. Bibb superior court. November term, 1893.

In the case of J. S. McTighe & Co. *et al. v.* the Macon Construction Co., the Macon & Savannah Construction Co., the Macon & Atlantic Railway Co., the Macon & Birmingham Railroad Co., and the Georgia Southern & Florida Railroad Co., Willis B. Sparks was appointed receiver of the properties of the defendants, and an injunction was granted as prayed in the petition of plaintiffs, who made the same a creditors' bill. The receiver of the United States Rolling-Stock Company intervened as a party plaintiff, and filed his petition against the Macon Construction Company, the Macon & Birmingham Railroad Company, the Macon & Atlantic Railway

Company and the Macon & Savannah Construction Company, and against Sparks as receiver of said corporations. From this petition it appeared, that on January 30, 1890, the rolling-stock company made a written contract (entitled an equipment lease) with the Macon Construction Company, whereby the intervener agreed to lease to said company 300 box-cars and 200 flat cars; and on September 4, 1890, a like contract was made between the same parties, for the lease of 400 box-cars and 100 flat cars. The cars stipulated for in the first contract were turned over by the Macon Construction Company to the Macon & Birmingham Railroad Company, and as to them a consent decree was rendered in November, 1893, thus terminating the litigation under that contract. Under the other contract only 75 box-cars and 100 flat cars were delivered, as the Macon Construction Company declined to accept the remainder contracted for. Those so delivered were turned over by said company to the Macon & Savannah Construction Company in part payment of the subscription of the former company to the capital stock of the latter, as part of the equipment to be furnished by said latter company to the Macon & Atlantic Railway Company under contract between them.

By the equipment lease before mentioned, the rolling-stock company (called the lessor) agrees to lease to the construction company (called the lessee) the 500 cars in question, for five years from October 1, 1890, upon the following conditions : It is agreed that the value of each box-car is $453, and that of each flat car $310. Upon delivery the lessee agrees to pay to the lessor twenty per cent. in cash of the value of each car delivered (making for the total cash payment $42,000), and in addition thereto, sixty consecutive monthly payments of $2,-829.33, each of which shall be represented by a note or lease warrant executed by the lessee, drawn to its own

order and by it indorsed. Said cars are the exclusive property of the lessor, and the lessee agrees to hold them until the determination of this lease, at its own risk, and then to return them to the lessor in the present good order and condition, reasonable wear and tear excepted, and without excuse of non-delivery on account of accident unavoidable or otherwise, unless the same shall have been purchased by the lessee from the lessor within the time and in the manner hereinafter specified. In case of default in the payment of any of said notes, or if the lessee violate this agreement in any respect, this lease shall immediately determine, and the lessee shall deliver up said cars to the lessor, and the sum paid or payable on said notes up to the date of such delivery shall be deemed an equivalent for the use of the property up to that date, and shall be retained as such by the lessor; and in case of any such default, the lessor or its assigns may seize all or any of said cars wherever they may be found, and resume possession thereof, free from every legal or equitable claim of the lessee, which is to hold the lessor harmless on account of any expense incurred by reason of such seizure. In case any of said cars be delivered by the lessee to the lessor by reason of such default, the lessor shall have the right to retain for its own use, or at its option to sell them and apply the proceeds to the payment of any of said notes representing installments of rents of the cars for the whole term of five years, whether said installments shall have fallen due or not, less interest at 5 per cent.; and if such proceeds be insufficient to pay said notes in full, the same shall be applied *pro rata* to their payment, without preference or priority and irrespective of the dates of maturity, and the lessee shall be liable to pay the deficiency to the lessor; but if such proceeds be more than sufficient to pay all of said unpaid notes with interest and expenses, the surplus shall be paid to the lessee. As an

inducement to secure the prompt payment of said notes, the same being the rent for the use of said cars, the lessor agrees, upon full payment of each of said notes, and the performance by the lessee of each of the conditions herein contained, and upon the payment of the further sum of five dollars, that it will sell the cars and execute and deliver to the lessee a bill of sale thereof, and the same shall thereafter be held by the lessee as its own property. The lessee agrees to keep the cars insured at its own expense for the benefit of the lessor, and to assign the policies of insurance to it; and on failure to do so, the lessor may insure them at the lessee's expense, which agrees to pay the same on demand, in addition to the rent. The lessee shall replace the cars lost by fire or otherwise destroyed, and in that case it shall receive from the lessor the amount collected from the insurance company on such loss. The lessee further agrees to pay all taxes on said cars, and to pay all charges for repairs and renewals, until the payment of each of said notes. This contract was recorded in the clerk's office on October 28, 1890.

As before stated, 175 cars were delivered under this contract, the average date of delivery being November 1, 1890. The Macon Construction Company failed to make the cash payment provided by the contract, but paid four of the lease warrants, leaving unpaid the cash payment of $12,995 and the rest of the lease warrants. Shortly after the appointment of the receiver, the intervener applied for an order requiring the return of the cars to it, or that the receiver be required to adopt the contract and pay the maturing lease warrants. This application was resisted by the receiver, and by the trustee of the first mortgage bondholders of the Macon & Atlantic Railway Co., the latter denying the right of the receiver to part with the cars, but disclaiming all responsibility for their use, whether on account of rental

or breakage, which could constitute a lien on the coupons or net earnings of the road, superior to the lien of the bondholders. The court denied the application, but ordered the receiver to gather in the cars and keep them insured and repaired, and keep a separate account of all the moneys received from the mileage on them. Afterwards an order was passed for the sale of the properties of the Macon & Atlantic Railway Co. and the Macon & Savannah Construction Co.; and the receiver reported to the court that no reason existed for longer holding the cars (which were intended to be used upon the Macon & Atlantic railway), and that it would be to the interest of all parties that the same be given up to the intervener. It was ordered that they be so surrendered; and the receiver delivered to the intervener 73 box-cars and 96 flat cars, the other six having been wrecked while in the receiver's use, except one which was destroyed on January 3, 1891, and the insurance on which, amounting to $475, was paid to the receiver on May 1, 1891. The average date of the return of the cars under the order was September 15, 1892, and the cost of transporting them was $1,195. In the order it was directed that all other issues respecting said cars be reserved for adjudication upon the hearing of the intervention, including any claim of the intervener for the rental value or mileage earnings of the cars.

The master, to whom this intervention with other branches of the case was referred, made a report in which he found (in brief) as follows: It appears from the evidence that the 175 cars in question were turned over to the Macon & Atlantic railway, and were held and used by that road from November 17, 1890, to March 15, 1891, the date of the appointment of the receiver, who continued to hold them as receiver of that road. He used them for the purpose of raising income for said road; it had no further source of income; and this in-

come was wholly devoted to preserving its property during the receivership. The usual and customary rentals of such cars were $9 per month for box-cars and $7 per month for flat cars. The money collected by the receiver from the insurance of the six wrecked cars has been paid over to the intervener. In determining the amount of rent which should be paid under the contract, the master made the calculation upon the basis of reasonable rental value of the cars, and not according to the mileage earned. For want of evidence to show the amount of mileage earned, the master was without information upon which to make a calculation on this line; the only direct, positive and satisfactory evidence submitted as a basis for estimating the rent due being that which fixed the rental, not at actual mileage, but at a reasonable value irrespective of the actual use. Upon this basis he found that for the period of four and a half months from the date of the delivery of the cars to the date of the appointment of the receiver, the respondents were liable for $6,187, and from the latter date to that of the return of the cars to the intervener, for, $24,204.52. Since said return, efforts were made by intervener to sell the cars, the box-cars being offered as low as $325, and the flat cars at $200. These efforts were unsuccessful save as to 48 cars which were sold at $180 each. Assuming the value of the cars at the date of their surrender to be what they were offered for, their total value would be $20,600 less than their original selling price. Four of the notes or lease warrants were paid, amounting to $11,512.42. If this amount be credited on the amount of rent due prior to the receivership, respondent's equity would be $5,328.42 paid on the lease warrants in excess of rents due prior to the receivership. No evidence was submitted as to the value of the cars after delivery. No attempt was made by the receiver or by the trustee of the first mortgage

bondholders to show that the property was worth more than the balance due on the intervener's debt; on the contrary, the evidence for the intervener, shown in the foregoing calculation, makes it certain that the cars are not worth the amount of its debt by a very large sum. In the absence of plea or tender of the balance of the purchase money with interest, or evidence that the property is still worth as much as the balance, respondents are not entitled to any deduction from the amount of hire or rental of the cars, on account of the partial payments made. In determining what amount should be allowed for depreciation in value of the cars by reason of their use from the date of their delivery to the construction company and the date of their return, the master was restricted to 72 box-cars and 46 flat cars received and examined at the works of the intervener at Anniston, Ala. (48 cars having been sold at Macon, as before stated). No evidence was submitted as to the condition of any of the cars, and in the absence of proof to the contrary, they are presumed to have been delivered in good or interchanged (?) condition Accepting the rules of the Master Car-Builders Association, offered in evidence, as the correct mode of determining what repairs were necessary to put the cars in condition for interchange of traffic, it would require an average expenditure of $18 on each of the 72 box-cars, and $13 on each of the 46 flat cars, making $1,894. Intervener claimed that this cost of repair should be added to the sum due for rental; and that it is entitled also to an additional sum estimated upon a depreciation in the value of the cars, of six per cent. annually. The testimony shows that this last amount is allowed only when there is an express agreement, or where cars are rented and rentals are calculated by mileage, and not where a fixed rent per car is paid. The master therefore rejects the claim for extra depreciation, but allows the cost of

repairs.    The cost of transporting the cars to Anniston under the court's order for their return, admitted to be $1,195, is allowed to the intervener.    The total of the amounts thus found for the intervener is $27,293.52, for which the master recommends that he have judgment, to be a first lien on the money in court arising from the sale of the property of the Macon & Atlantic railroad.    Interest on the amount found is not allowed.

On July 25, 1893, a consent order was passed, setting the cases made by the various interventions for trial on November 13, 1893, and providing, among other things, that all exceptions to the master's report should be filed on or before October 1, 1893.    On September 25, 1893, the trustee for the first mortgage bondholders, with other defendants, filed their exceptions to the master's report.    The cases came on for hearing during the second week of November, 1893, and the hearing was begun before Judge GAMBLE; the report of the master was read to the court, and the respondents' exceptions were presented; but the hearing was not finished, by reason of the fact that said judge was compelled to leave the city.    On January 24, 1894, the cases again came on to be heard before Judge GRIGGS, and the respondents presented further exceptions to the master's report, which they offered by way of amendment to those filed previously.    Intervener objected to the allowance of the amendment, but the objection was overruled. He also demurred to the exceptions of respondents, because they were not classified into exceptions of law and fact; and the demurrer was overruled.    There was also an exception by the intervener, to the ruling of the master disallowing interest upon the amounts found to be due for the rental of cars.    Upon the hearing the court ordered that the cause be referred back to the master, with instructions to take evidence, first, on the mileage earned by the 175 cars in question; second,

how much of that mileage was appropriated for the benefit of the Macon & Savannah Construction Co., and how much for the benefit of the Macon & Atlantic Railway Co., confining his examination and report to these matters. To his supplemental report the respondents filed five exceptions. By consent, all matters involved in the exceptions to the two reports were passed on by the court without a jury. The court decreed as follows: Intervener is entitled to recover of the Macon & Savannah Construction Co., and the Macon & Atlantic Railway Co., $7,154.75, which sum represents the liability of the railway company of $4,309.60, and the liability of the construction company of $2,845.15; which finding is declared to be a first lien on the fund arising from the sale of the properties of said companies. This conclusion is reached in the following manner: The amount of mileage earned by 175 cars and appropriated for the benefit of the Macon & Atlantic Railway Co., is found by the master to be $5,462.29, and that appropriated for the benefit of the Macon & Savannah Construction Co., is found to be $3,931.65, aggregating $9,393.94, which last named sum is reduced by taking therefrom $5,328.42, being the excess of payment by the Macon Construction Co. over the rental value of 175 cars before the receivership in this case; leaving $4,065.52. To this is added the aggregate of the cost of repairs of the cars after their return ($1,894), and the cost of their transportation to Anniston under the court's order ($1,195), which two amounts are to be divided between said corporations in the proportion of 63 per cent. to the Macon & Atlantic Railway Co., and 37 per cent. to the Macon & Savannah Construction Co. The court further decrees, that the master in his original report committed error, and his findings are set aside and his supplemental report approved. All the exceptions to the original report, as well as those to the supplemental

report, are overruled, except the fifth amended exception taken by respondents to the original report, which is sustained.

The intervener excepts to this decree, and to the overruling of his objection to the allowance of the amended exceptions to the original report of the master, and to the overruling of his demurrer before mentioned. By cross-bill, respondents except to the overruling of their exceptions to the reports, other than the exception which was sustained. The exceptions to the original report of the master are, that the master erred:

1. In holding that intervener was entitled to recover $27,293 for the rental value of the cars from March 15, 1891, to January 15, 1892, there having been no contract for the payment of such rental, and it appearing that the lease warrants to be paid by the Macon Construction Co. amounted only to $2,829.33 per month as the rental for 400 box-cars and 100 flat cars, and that the number of cars to be delivered was reduced, by a partial rescission of the contract, to 75 box-cars and 100 flat cars, and that the amount due for their rental could only be in the proportion that would be due for that number, charging the rent upon a proportionate basis fixed according to the right set out in the original contract, to be determined by the number of cars used under the modified agreement herein referred to.

2. In holding that the rent due prior to the receivership was to be at the rate of $7 per month for the flat cars and $9 per month for the box-cars, instead of finding that the rent to be charged should be in proportion for the 175 cars delivered to that agreed upon in the lease contract for 500 cars.

3. So as to the finding of rent subsequent to the receivership.

4. In finding that the respondent's equity arising out of the payment of $11,515.42 made prior to the receiv-

ership, would be only $5,328.42; when he should have found, under the evidence, that respondent's equity in the cars amounted to $7,553.42, that being the amount paid on the lease warrants in excess of rent due prior to the receivership.

5. In finding that defendants were entitled to no credit growing out of the equity hereby created by reason of such payment in excess of the amount due for rent.

6. In finding that the evidence showed that it would require an average expenditure of $18 on each of the 72 box-cars, and $13 on each of the 46 flat cars, to put them in repair; when the evidence showed that the cost would not exceed $9 and $7, respectively.

7. In charging defendants with the $1,195 cost of transportation, the contract of lease only providing that the lessor should have the right to take possession of the cars wherever found.

8. In finding an amount greater than is shown to be due upon any correct basis of calculation that could have been adopted.

9. In adopting the full and extreme limit of liability claimed by intervener, not attempting to reconcile the evidence submitted by plaintiff with that of defendant, but finding in every instance the highest amount claimed to have been proved, and utterly ignoring defendant's theory.

The amended exceptions filed by respondents on January 24, 1894, are, that the master erred:

1. In finding that the Macon & Atlantic Railway Company was indebted in any sum to the intervener; it appearing from the evidence that the contract for the sale of the 175 cars was made between the Macon Construction Company and the rolling-stock company; that they were turned over by the construction company to the Macon & Savannah Construction Company, and not to the railway company, which has done no act

and made no contract by which it has incurred any liability; that the receiver held the cars and received the income therefrom, not as receiver of said railway company, but as receiver of the Macon Construction Company; and that said railway company and the Macon & Savannah Construction Company were separate and independent corporations, and the latter had never completed the construction of the railroad nor turned the road and its equipment over to the railway company.

2. In not finding and specifically reporting the exact amount received by the receiver from the mileage of the cars; this amount being, from the evidence, a little over $9,000, and having been received by him as receiver, not of the railway company, but of the Macon & Savannah Construction Co.

3. "In not finding that the $11,562.29, the amount of mileage earned by the said 175 as disclosed by the evidence, and also in not finding that the defendant company was liable only in the sum of $11,562.29, the amount of the mileage earned, and on this liability that said payment of $11,515.42 should have been allowed as a credit."

4. In not finding that the Macon Construction Co. alone is liable for the purchase money of the cars and the reasonable hire thereof; and in not finding that the Macon & Atlantic Railway Co. was not indebted in any sum, either for the purchase of the cars or for their reasonable hire.

5. In computing the rental value of the cars on the basis of reasonable hire, and not on the basis of actual mileage earned, the latter being the true rule and basis.

6. In finding that $27,293.52 be a first lien in favor of the intervener, and be transferred to the money in court arising from the sale of the property of the Macon & Atlantic Railway Co., said finding being contrary to law and evidence.

The objections to the allowance of these exceptions as an amendment to those previously filed, were: (1) That no reason was shown why they were not filed within the time prescribed in the consent order of July 25, 1893. Intervener's counsel stated in his place, that the time for filing exceptions under the order originally granted would have expired in August, 1893, and on July 25, counsel for the exceptors applied to intervener's counsel to consent that the time for filing exceptions be extended to October 1, 1893, which consent was given; and thereupon the agreement of counsel was embodied in the order of July 25, 1893. (2) That the proposed amendment added new and additional exceptions after the time limited for the making of the same had expired, and were not in fact either in substance or form mere amendments to the exceptions previously filed. (3) That the amendment was not authorized by law.

The exceptions to the master's supplemental report are five exceptions of fact, and are, substantially, that the master erred in finding that various amounts disbursed were appropriated for the benefit of the Macon & Atlantic Railway Co., when he should have found that no part of the same went to the benefit of that company, and that it was not liable therefor; but that portions of the same went to the benefit of the Macon & Savannah Construction Company.

H. C. TOMPKINS and HILL, HARRIS & BIRCH, for Lane, receiver. WASHINGTON DESSAU, A. L. MILLER, HARDEMAN, DAVIS & TURNER, CHARLTON, MACKALL & ANDERSON and C. L. BARTLETT, *contra*.

LUMPKIN, Justice.

This case arose out of litigation upon an intervention filed by the receiver of the United States Rolling-Stock Company, in the case of McTighe & Co. against several corporations and W. B. Sparks, who had been appointed

receiver of the same.    The reporter's statement sets forth
such of the facts as will, in connection with the head-
notes and this opinion, be sufficient for an understand-
ing of the rulings made.

1. The first matter for consideration relates to a ques-
tion of practice.    Section 4203 of the code provides that
the report of a master shall be subject to exceptions for
such time as the court may allow.    These exceptions,
however, are not pleadings in the sense that they may
be amended or added to as matter of right at any stage
of the case.    *Suttles et al.* v. *Smith, adm'r*, 75  *Ga.* 830.
It may, nevertheless, be considered as very well settled,
that even after the time for filing exceptions fixed by an
order of the court has expired, it is still within the discre-
tion of the judge to allow the filing of other and further
exceptions.    *Bazemore* v. *Davis*, 69  *Ga.* 745.    This dis-
cretion, however, must be exercised upon proper cause
shown, and the judge may not arbitrarily allow new and
distinct exceptions to be filed after the expiration of the
time originally limited.    *Arthur* v. *Gordon Co.*, 67  *Ga.*
220; *Suttles et al.* v. *Smith, adm'r, supra.*    The amend-
ment to an exception to the auditor's report dealt with
in *Poullain et al.* v. *Poullain*, 76  *Ga.* 422, was not a new
and distinct exception, but merely supplied defects in
one already filed.

In view of the foregoing decisions, we think the court
erred in allowing the new exceptions filed in this case
after the time fixed for filing exceptions by an order
previously passed had expired.    No reason for an exten-
sion of time was stated, nor any excuse given for failing
to file the new exceptions at the proper time; and it is
quite clear that the court, in allowing them to be filed
after this time had expired, did not attempt any exercise
of discretion.    The error thus committed operated in-
juriously against the opposite party, for several reasons,
not the least of which was that it resulted in a re-refer-

ence to the master, and caused serious delay in the progress of the case.

2. As will have been seen from the official report above referred to, the rolling-stock company, whose receiver filed the intervention with which we are now dealing, delivered the cars the rental of which is in controversy to the Macon Construction Company, which delivered them to the Macon and Savannah Construction Company in part payment of a subscription to the capital stock of the latter company, and as a portion of the equipment to be by it furnished to the Macon & Atlantic Railway Company. Sparks subsequently took possession of these cars, as the receiver of the company last named. This explains how his possession as such receiver originated. The other facts pertinent in this immediate connection are sufficiently summarized in the second head-note. It must be understood that in speaking hereinafter of the owner of the cars, we refer to the receiver of the rolling-stock company, he standing in the place of such owner and representing its interests. It is quite certain that such owner was entitled to some rent for the use of these cars. We cannot see upon what principle this rent was to be estimated upon the basis of what was actually received for their use or hire by the receiver of the railway company. There was certainly no contract to this effect, and in the absence of one, the case, in view of all the facts disclosed by the record, falls within the rule that where one uses the property of another under circumstances entitling the owner to payment for its hire, the amount to be paid, unless controlled by contract, should be arrived at upon the basis of the actual value of the property for the use for which it was intended. We shall, before concluding, attempt, briefly, to show that the original lease contract under which the cars were delivered is not applicable in fixing the amount to be paid for the rent of them.

3. It was strenuously insisted here that the bondholders of the Macon & Atlantic Railway Company were not represented in this litigation by their trustee, the New York Security & Trust Company, and therefore neither resisted the restoration of the cars to their owner, nor in any manner participated in procuring the order of court by which such restoration was refused. Assuming, for the moment, that this contention is well founded, we still think that, in view of the facts of this case, the claim of the car-owner is, upon the general principles of equity jurisprudence, to be preferred to that of these bondholders. The expenses of a receivership— which, of course, include those incurred in the due administration by the receiver of the estate in his hands— may often with propriety be recognized as having a first lien upon the assets, extending even to those derived from a sale of the *corpus.* It appears that the receiver used these cars for the purpose of raising income for the Macon & Atlantic Railway Company; that it had no other source of income, and that this income *was wholly devoted to preserving its property during the receivership.* If the receiver, under the court's order and direction, had borrowed money for absolutely necessary expenditures in taking proper care of the property in his hands,—such as insurance premiums, indispensable repairs, and the like,—these charges would be classed as expenses of administration, and paid accordingly. Here, under such an order, he kept in his possession, and used for purposes of this nature, the cars of another, and the benefits derived from his so doing inured directly to the company and its creditors, the chief of which were these bondholders. Hence our conclusion that, under all these facts and circumstances, the rental of the cars was chargeable to the fund arising from the sale of the property, as expenses of administration; and, like costs, receiver's fees, attorney's fees, and other similar charges

with which all property legally administered is burdened, took preference over the claims of the bondholders.

But suppose that, independently of the alleged resistance by the trustee of these bondholders of the return of the cars, this conclusion is not sound and cannot stand upon the reasons just given in its support, we are very certain that the record before us plainly shows that the New York Security and Trust Company was before the court in its capacity as trustee for the bondholders of the Macon & Atlantic Railway Company, and that as such trustee it participated in procuring the order of refusal above mentioned. If this is true, it must necessarily follow that both the trustee and the bondholders represented by him are estopped from denying that the rental of the cars is an expense of the receivership of superior dignity to the lien of the bondholders' mortgage. This proposition is too plain for argument, and therefore will not be discussed. We shall simply endeavor to show that the assumption of fact upon which it is to be supported is the truth of this matter. As already shown, the main case in which the intervention now under consideration arose was begun by McTighe & Company against several corporations. Among them were the Georgia Southern & Florida Railroad Company, the Macon & Birmingham Railroad Company, and the Macon & Atlantic Railway Company. The original petition did not pray for process against any trustee of any of the bondholders of any of these companies. Afterwards, however, on the 13th day of June, 1891, the judge passed an order in the following words:

"This intervening petition having come on for a hearing before me this day, and the petitioner having amended the same by prayer asking that the trustees of the bondholders of the defendant railroad companies be made parties and served: It is ordered by the court that the petition be set for a hearing before me at Ma-

con, Georgia, on the 27th instant at 9 a.m., and that eight days notice of the petition and amendments thereto, and of this order, be given to Messrs. Hoke & Burton Smith, solicitors for the trustee of the bondholders of the Georgia Southern & Florida Railroad Company, and that a copy of the same be served by the petitioner, or his duly authorized agent, upon the New York Security & Trust Company, 46 Wall street, New York, trustee of the bondholders of the Macon & Birmingham Railroad Company and the Macon & Atlantic Railroad Company, eight days before said hearing. Further ordered that the receiver, upon said hearing, make report to the court concerning the matters about which the amended prayer of the petitioner prays for."

It will be seen that service was ordered to be made upon Messrs. Hoke & Burton Smith, who were designated as solicitors of the trustee of the bondholders of the Georgia Southern & Florida Railroad Company, and that service was also ordered to be made upon the New York Security & Trust Company, trustee of the bondholders of the other two companies. On the 20th of June, 1891, "upon motion of Messrs. Hoke & Burton Smith, counsel for trustee of bondholders, the New York Security & Trust Company," it was ordered that the hearing of this very intervention be set for July 4th. It was not then heard; but, on the 15th of that month, the trust company filed two brief papers in the nature of answers to the intervention. They are in the following words:

"The New York Security & Trust Company, trustee for the bondholders, having been made a party in the above stated case, comes and denies all the statements in the petition of intervener, and prays that strict proof be had.                    Hoke & Burton Smith,
"Attys. for New York Security & Trust Co.,
"Trustee for the bondholders."

"The New York Security & Trust Company, trustee for the bondholders, disclaim any responsibility for the use of said cars by the receiver; while it denies the right of the receiver to part with said cars, it disclaims

all responsibility for their use, whether on acct. of rental or breakage, which can constitute a lien superior on the coupons or net earnings of the road to the lien of the bondholders.　　　Hoke & Burton Smith, attys."

And further, this same trust company, by its same counsel, filed a written objection to the right of the court to finally dispose of this intervention without a jury. The Messrs. Smith undoubtedly represented the trust company. It certainly was the trustee of the bondholders of two of the corporations above named, including the Macon & Atlantic Railway Company. It was, beyond question, a party to the case in the character of trustee for each set of these bondholders, and it appeared, everywhere and every time it shows up in the record, as "trustee for the bondholders." What bondholders? It seems indisputably clear that the answer should be: All the bondholders of the two companies. This is the logical sequence of its making the general appearance above stated. Otherwise, it should have limited its appearance and specified for what class or classes of the bondholders it intended to appear or did appear. There is not in the record even a hint or suggestion that anything of this kind was done or attempted. We have, therefore, seriously and deliberately reached the conclusion that this trust company, as a party to this litigation, represented the interests of all these bondholders, including those of the Macon & Atlantic Railway Company.

In perfect candor, we would not have devoted so much space to this particular matter, but for the fact that able counsel, evidently with perfect sincerity, earnestly contended in the argument made before us that the bondholders of this company were not before the court through or by this trust company, and also asked for a rehearing on the ground that this court had fallen into a misapprehension on the subject. The rehearing was denied, because after further examination and re-

flection we felt satisfied that our former view of this matter was correct, and for the additional reason that we did not think it made any substantial difference, in adjusting the true equities of this case, whether the trust company, as the trustee of this set of bondholders, contested the return of the cars to their owner or not.

Our decision in this case was not made hastily, but after much thought and deliberation. As to that branch of it to which the present division of this opinion relates, we based our judgment upon both the reasons assigned. We are still satisfied that both are sound, and especially that one of them which rests upon the assertion that the trust company was before the court as the trustee of the bondholders of the Macon & Atlantic Railway Company, and in that capacity represented and acted for these bondholders in the present litigation.

4. We have not passed upon those exceptions to the master's report which the court improperly allowed to be filed, and to which reference has already been made. In the view we take of matter, they are not in the case, and should have no effect upon its determination by us.

It is apparent from the undisputed facts, that after the receiver had taken possession of the cars, the court, upon the application of the owner, ought either to have adopted and carried out the lease contract, or to have ordered the restoration of the cars. It did neither, but peremptorily ordered the receiver to retain and use the cars; and the receiver did in fact retain and use the cars until, after the lapse of a considerable period of time, he was finally ordered by the court to return the cars to their owner. None of the parties excepted to the order of the court refusing a surrender of the cars, and may therefore be treated as acquiescing in it. Consequently, the equities between the owner of the cars and the railway company should be adjusted just as if they had voluntarily done what was accomplished by the court's action in the premises.

In this view of the matter, the final return of the cars under the court's direction was the same thing, in effect, as would have been a final rescission of the lease contract by the parties to it; and consequently, as stated in the second division of this opinion, it is not applicable in fixing the amount of rent to be paid for the cars. Its terms should not be referred to for this purpose, because it was practically canceled by what occurred, and thereafter had no legal or equitable bearing upon the question of the receiver's liability in the premises.

We have, upon the basis which we think is the true and just one, arrived at our conclusion as to what are the exact equities in the case, so far as these parties are concerned.

(*a*) The time for which the rental of the cars is chargeable to the assets of the railway company is obviously that during which the company and its receiver had possession of and used them.

(*b*) As a general rule, compensation for the ordinary wear and tear of a thing rented is included in and covered by the rental charge; and no reason occurs to us why this rule should not apply in the present instance. But depreciation arising from careless use, or from abuse, and which is greater than that caused by ordinary and proper use, is a different matter, and ought to be paid for, or else the owner will get nothing for the injury to his property thus occasioned.

(*c*) The expenses incurred in returning the cars as the court ordered ought not to fall upon the owner; for it seems clear that the latter cannot be fairly charged with the cost of a delivery which it was manifestly the court's duty to effectuate.

(*d*) We have said that interest should be allowed on all the above claims from the date upon which the cars were returned to the owner. The claim for the rental was certainly due not later than the day on which the owner received back the cars, and ought at least to bear

interest from that time, if not from a previous date. As it would be very difficult to fix with absolute fairness upon an earlier date, we designate the day of delivery as that from which to compute interest on this item; and surely no injustice thus results to the company or its other creditors. As the cars ought, in justice, to have been returned uninjured, save as to the usual and ordinary wear and tear, the claim for depreciation arising from the fact that they had been otherwise and more seriously damaged, ought to have the force of a demand existing at the date of their restoration. If one injures the property of another under circumstances entitling the owner to compensation, he can recover the same, even if he never repairs the injury, and the demand is usually due when the injury is done. Moreover, it would seem that, relatively to the extra damages, immediate repairs were necessary to render the cars capable of producing a fair income; and therefore, presumably, the repairs would be made at once, or at any rate, in legal contemplation, the owner was entitled to have them made without delay, and to be promptly supplied by the party therefor with the means essential to this purpose. Hence we say, interest should be computed on this item from the date of the delivery to the owner. It needs, we think, no argument to show that this is also the date from which interest should begin to run on the amount paid by the owner as expenses incurred in the making of the delivery ordered by the court.

(e) The account of the car-owner based on all these claims should, of course, be credited with all payments on the lease contract.

In the light of the foregoing, we hope the true balance of principal and interest can be fairly ascertained, and this controversy finally adjusted and brought to a conclusion.

*Judgment on main bill of exceptions reversed.*
*On cross-bill of exceptions, affirmed.*