MOHR–WEIL LUMBER COMPANY *v.* RUSSELL *et al.*

1. An application by a party to a case in equity for the allowance of an attorney's fee for bringing a fund into court is, though the attorney for whom the fee is sought joins therein, to be regarded as a proceeding in the name and right of the party, and not of the attorney.
2. No party is entitled to such an allowance out of the proceeds of property which he, for his exclusive benefit and to the injury of his adversary, causes to be placed in the hands of a receiver; nor can any party, except in cases of bad faith, stubborn litigiousness, and the like, charge against the opposite party as "costs" attorney's fees incurred in litigation.
3. A contract to pay the maximum legal rate of interest compounded monthly is in no event valid unless in writing.
4. Though the main purpose of the owner of a manufacturing plant, in delivering the possession, management, and control thereof to a creditor, may be to enable the latter to obtain from the proceeds of its operation payment of a certain indebtedness, yet where the contract expressly provides that such creditor may, at his option, remain in possession for a specified period, his right to do so would not, if he complied with all of his undertakings, terminate upon the satisfaction of the indebtedness before the expiration of that period.
5. Exceptions to an auditor's report should not be stricken on demurrer when they point out the alleged errors in such manner that the nature of the same can be clearly and readily understood when considered in connection with the findings of the auditor to which such exceptions refer.
6. It is not erroneous to strike exceptions not meeting the requirement just indicated, or cause for reversal to strike exceptions which, though sufficient as to form, are manifestly without merit.
7. It is within the discretion of the court to allow or reject new exceptions to an auditor's report after the time for excepting thereto has expired; but the privilege of filing new exceptions should be denied unless good cause for not duly filing them is shown.

Argued November 10, 1899.— Decided January 27, 1900.

Exceptions to auditor's report. Before Judge Smith. Wilcox superior court. June 29, 1899.

*E. H. Williams*, and *Hardeman, Davis & Turner*, for plaintiff. *Eldridge Cutts* and *Hal Lawson*, for defendants.

LUMPKIN, P. J.  A motion was made to dismiss the present writ of error, on the ground that Messrs. Cutts & Lawson were not made parties to nor served with the bill of exceptions. This motion was not well taken.  Our views upon it and upon the question therewith closely connected, viz., whether or not that portion of the judgment now under review allowing these attorneys a fee of $1,500 was erroneous, will be given immediately after stating the facts of this case; but, as will be perceived, the particular facts pertaining to the two matters just referred to, for the obvious reason that it would have been very inconvenient to present them at the beginning of the following preliminary statement, appear at its conclusion.

During the March term, 1897, to wit, on May 22 and August 7 of that year, we dealt with separate writs of error growing out of the litigation involved in this case.  See 102 *Ga.* 563, 593.  The decisions rendered on these two occasions related exclusively to preliminary matters.  The case is now here on its merits after final judgment in the trial court, and presents questions which we have not heretofore considered or passed upon.  The record discloses that Mrs. Martha B. Russell was the owner of a shingle-mill, the operation of which was the subject-matter of several contracts and finally of much controversy between her and the Mohr–Weil Lumber Company.  In most of the transactions between her and it, she was represented by her husband, A. B. Russell, as her general agent.  We will therefore, for convenience, though both Mr. and Mrs. Russell are parties to the case, hereinafter use simply the name "Russell" when referring to them, and, for the sake of brevity, will allude to the other party as "the company."

On March 13, 1893, the company entered into a written contract with Russell, by the terms of which the former agreed to make to the latter certain advances and to take the entire product of the mill at specified prices, Russell contracting to fur-

nish "at least 40,000 shingles per day on an average."   Opera-
tions were carried on under this contract until December 25, .
1893, when the parties entered into another written contract
which purported to be a substitute for the first one.   At the date
last mentioned, Russell had become indebted to the company
a considerable sum and had executed promissory notes for the
same, bearing interest at 8 per cent.   This fact was recited in
the new contract, and it was therein stipulated that the com-
pany was to make an additional advance of not exceeding
$3,000 "for the purchase and improving of machinery, timber,
and running business, to be repaid in 12 months; with interest
at 8 per cent.," and that Russell was to furnish and the com-
pany to accept the entire output of the mill.   A new scale of
prices for shingles was fixed in this instrument, and it stipu-
lated that "at least 80,000 shingles were to be furnished per day
upon an average," Sundays and legal holidays excepted.   This
contract was to remain in force for three years, and the scheme
of it, as shown by other stipulations therein, was that Russell's
existing indebtedness to the company and any further indebt-
edness to it which he might incur should be discharged by the
delivery of shingles, it being expressly provided that all pay-
ments therefor, "except sufficient amount for running expenses
at mill," were to be applied to such indebtedness.   On Novem-
ber 20, 1895, Russell, being still largely indebted to the com-
pany on the notes and on open account, made with it a third
written contract which recited that it was executed "for the
purposes of speedily carrying out agreements already existing
between the parties," and stipulated that "It is well understood
by both parties that this instrument is but a part and parcel
of the contract now existing between the parties and supple-
mentary thereto."   By its terms, Russell was to turn over to
the company the entire control and management of the shin-
gle-mill, with the right to use and operate the same as it might
deem best, "for any length or space of time . . not to exceed
five years."   The further stipulations of this instrument, now
material, were as follows:   All the past "transactions" between
the parties were confirmed as just and legal.   The company
agreed to "accept the management and control of said prop-

erty and to operate the same in conformity with the scope, objects, and purposes set forth in the contract now existing between the parties, for such time as [it] may think proper, not to exceed five years," and was to "furnish all money necessary to carry out this supplementary agreement." "All sums of money advanced or expended in operating said shingle-mill" by the company were to be charged to Russell. There was nothing in the last contract expressly referring to any oral agreements or transactions in parol between the parties.

In January, 1897, Russell took possession of the mill, and discharged all the company's employees. It filed an equitable petition to enjoin him from further interfering with the property. The answer averred that the conduct of Russell in taking possession of the mill was lawful and proper, for the reason that the company had in many ways (the particulars as to which were set forth) violated its contract, to the injury and damage of Russell. The answer was in other respects one in the nature of a cross-bill. It denied that Russell owed the company anything, because, as alleged, the output of the mill, properly and efficiently operated under the terms of the contract, would have been much more than sufficient to pay off all of Russell's indebtedness. It further set up that the company, by its failure to so operate the mill, had greatly damaged Russell, and prayed for an accounting, alleging that the same would show that the company was indebted to Russell a large balance, for which judgment was asked. There was also a prayer for the appointment of a receiver to take possession of and manage the property until the respective rights of the parties could be ascertained and fixed by an appropriate judgment. A receiver was appointed and other interlocutory proceedings were had, but further reference thereto is, for the reason stated at the outset, not now necessary. The case was referred to an auditor, whose report, as will presently more fully appear, was in the main adverse to the company. At the hearing before him much evidence was introduced. To sum the same up very briefly, it may be said that the principal allegations of both the petition and the answer were supported by testimony—in other words, there was much conflict. One of

the most important questions at issue was whether or not the company had operated the mill skillfully, efficiently, and according to contract. Aside from the dispute over this, the company contended, and introduced evidence tending to prove, that there had been, while Russell was running the mill, a verbal agreement for a reduction in the price of shingles, and that this agreement was in effect after the company took charge of the plant; and further, that Russell had also orally agreed that the interest to be charged against him should be compounded monthly. Russell admitted that he had at one time agreed to a temporary reduction in prices, but denied that this agreement had any relation to the period covered by the last written contract, and he also denied the alleged agreement as to compound interest, supporting his contentions as to these matters by his sworn testimony as a witness. Still another hotly contested issue was whether or not Russell was properly chargeable with the expenses incurred by the company in making certain improvements which, without consulting Russell, it had decided were necessary to a successful operation of the mill property. It appeared at the hearing before the auditor that the company had converted the mill from a one-story to a three-story building, and had also purchased an entirely new boiler and other appliances, the cost of which was included in its account against Russell, upon the theory that the same was a legitimate charge under the terms of their written contract.

To the auditor's report the company filed six exceptions of fact and twelve of law. One of the latter (the 7th) was, however, subsequently voluntarily withdrawn. The court, on demurrer, struck all the remaining exceptions, both of law and of fact, except the 2d and 3d exceptions of law, which were overruled as being without merit. The company assigns error upon this disposition by the court of its exceptions.

After the trial judge announced that he would sustain the demurrer to the exceptions of fact, the company offered to amend those exceptions and also its exceptions of law. The motion was denied, and this is assigned as error. Before the final judgment was entered, Messrs. Cutts & Lawson presented to the court a petition which, after stating the case, began : "And now come

Cutts & Lawson, attorneys, and A. B. & M. B. Russell, and show to the court the following facts." The petition then proceeded to allege that Cutts & Lawson were the only attorneys for the Russells, and that the receivers had sold a large lot of shingles, "thereby bringing into court a fund out of which taxes, debts for labor, and other expenses of operating said plant have been paid, and out of which court costs and expenses are to be paid." This petition concluded with a prayer in behalf of the "movants" that the attorneys be allowed a fee of $1,500 for filing the cross-petition and bringing said fund into court, and that the receiver be ordered to pay the same. It was signed : "Cutts & Lawson, in propriis personis & Attorneys for A. B. & M. B. Russell." The final judgment, to which numerous exceptions were taken and which was substantially in accord with the conclusions of the auditor as to the matters referred to him, also embraced a paragraph allowing a fee of $1,500 to Cutts & Lawson, it being in that paragraph directed that the receiver pay to them this amount or any part thereof, "if he shall have funds on hand for such purpose," and, if he has no funds with which to pay the same, that this fee be charged against the company and the individual members thereof as "costs," to be collected by execution in favor of A. B. & M. B. Russell for the use of Cutts & Lawson.

1. It is certainly true that, up to the time the petition for the fee was filed, Cutts & Lawson were not parties to this case. Otherwise than as attorneys, they had no interest in the subject-matter of it, and there was nothing in the pleadings in any manner connecting them personally with the litigation. Did the filing of this petition make them parties? We think not. They had not, in their own right, any claim against the company or upon the fund in the receiver's hands for fees. If, for any reason, their clients were entitled to have a portion of this fund appropriated to the payment of any of the expenses of litigation, it was a matter upon which these clients might petition the court. This, we think, is what was done. The Russells were joined in the petition and were the real "movants" therein. Properly, Cutts & Lawson should be regarded as mere usees. The court seemed to take this view, for it ad-

judged that if the receiver had not the funds with which to pay the $1,500, its collection should be enforced by execution in favor of the Russells for the use of Cutts & Lawson. It was insisted here that this petition was an independent intervention presented by Cutts & Lawson, and that the court's favorable action upon it necessarily made them parties to the case and therefore persons interested in sustaining the judgment. The reply is, that the petition shows on its face it was not such an intervention. The Russells were surely petitioners as well as Cutts & Lawson, and if the latter desired to become parties in their own right and independently of their clients, why did they not make the application without joining the Russells? They are good lawyers, and we take it that, as such, they knew a petition of this kind could have no lawful standing unless made by and in the right of the parties they represented. As was remarked by Mr. Justice Cobb in *Morgan* v. *Fidelity Co.*, 101 *Ga.* 391, which was a proceeding in equity: "Counsel have no inherent right in such a case to demand an allowance of fees. The right is in the client to appeal to the court for the allowance of an amount sufficient to pay the expenses which he has incurred." In this connection, Trustees v. Greenough, 105 U. S. 527, and Stuart v. Boulware, 133 U. S. 78, are somewhat in point. Upon the well-founded assumption that our learned brethren who obtained the allowance of this fee knew the law, the insertion of the names of the Russells into the application is easily understood; and, on the whole, we have no great difficulty in holding that it was the Russells' petition, and that, as stated above, the attorneys should simply be regarded as usees, who were not parties to the case. It follows that it was neither necessary nor proper to make them parties to the bill of exceptions nor serve them therewith. The case of *Barksdale* v. *Bunkley*, 26 *Ga.* 398, which they cite, does not help them. An examination of it will show that the attorneys there were in fact parties to the case submitted to the judge for decision, and expressly reserved the right to except thereto.

2. Allowing the fee of $1,500 to Cutts & Lawson was totally unauthorized. The bringing of a fund into court operates for

the benefit of those who share in it.    Compensation for services
rendered in placing a fund where the court can administer it
may fairly be regarded as an expense chargeable to those among
whom it is distributed.    The only just and reasonable basis
for paying out of money brought into court the fees of the at-
torneys by whose services this result was produced is, that by
rendering those services they did something of value to the
successful claimant or claimants of the money.    If the attor-
ney of one creditor brings into court a fund, and thus aids
other creditors of the same debtor in reaching his assets, the
client at whose expense such attorney was engaged is entitled
to reimbursement out of the fund; for in this way all the ben-
eficiaries are made to share equitably and ratably in an ex-
pense which should be common to them all.    Even then, the
attorney, though he usually gets the money, is not directly en-
titled to it; for, strictly speaking, the allowance is for the ben-
efit of the client as an expense incurred in behalf of all inter-
ested.    These familiar propositions require no argument or cita-
tion of authority to support them.    They have, however, no
application to the present case.    Cutts & Lawson did not, by
having a receiver appointed, bring anything into court for the
benefit of the Mohr–Weil Lumber Company.    On the contrary,
this step was decidedly to its injury.    There was a serious con-
troversy as to who was entitled to possession.    The company's
claim to possession was defeated by the receivership, and the
impounding of the property was sought and obtained by Rus-
sell as a thing for his exclusive benefit.    It never was or can
be a principle of law or equity that a party who for his own
benefit has property placed in the hands of a receiver, to the
injury of his adversary and over his protest and objection, can
compel the latter to pay counsel fees thus incurred, except in
cases of bad faith, stubborn litigiousness, and the like, and
then only after it has been adjudged that the party to be charged
is, because of his contumaciousness or bad conduct, liable to
the person thereby injured for the amount of such fees.    There
was no such adjudication, or occasion therefor, in the present
instance.    If the money in the receiver's hands derived from
sales of shingles belonged certainly to Russell, and if there

was enough of it to pay the $1,500, the company was not injured by this portion of the judgment; but here are two very large "ifs," and moreover, the judgment made the company liable for this fee as "costs" in case the receiver had no funds with which to pay it. The judgment in so far as it allowed the fee at all was inappropriate and wrong. The petition for it ought to have been rejected altogether. Not even upon the theory that the proceeds of the shingles belonged to Russell was this the proper manner for his counsel to collect their fee.

We will now deal briefly — for otherwise this opinion would become too greatly expanded — with the company's exceptions to the auditor's report, stating generally in connection with each the facts essential to an understanding of what we rule.

3. The auditor found as matter of fact that the debt of Russell to the company on open account was, on November 20, 1895, a specified amount "after eliminating interest illegally charged in said account," and as matter of law that it was per se usurious to compound interest monthly at the rate of 8 per cent. per annum. The company's first exception of fact, which related to this finding, was, under the rule laid down by this court in *Mason* v. *Commissioners*, 104 *Ga.* 35, too loose and general, except that it made the distinct point that there was no illegal charge of interest. By its 6th exception of law, the question as to usury is likewise sufficiently presented for determination. But we do not think either of these exceptions was, under the undisputed facts, meritorious, and therefore it is immaterial how they were eliminated from the case. The reason for this conclusion is stated in the third headnote. In support thereof we need only cite § 2876 of the Civil Code. There was no contention on the part of the company that Russell's alleged oral agreement to pay interest at the rate of 8 per cent. per annum, compounded monthly, was ever reduced to writing. The written contract between the parties contained a stipulation that the advances made by the company were "to be repaid in 12 months with interest at 8 per cent.;" but certainly, this stipulation could not be tortured into an agreement contemplating the compounding of interest monthly at the rate named or any other. Accordingly, whether a contract in writing to pay the maxi-

mum legal rate of interest, compounded monthly, would or would not be open to attack for usury, is not now material.

4. The auditor reported as matter of law that the contract between the company and Russell was not to remain in force after the satisfaction of the latter's indebtedness. Complaint of this conclusion is made in the company's 2d and 3d exceptions of law. While, as we have seen, the court did not strike these exceptions on demurrer, it did overrule them as being without merit. This was erroneous. Whatever relation was established between the parties by virtue of their written contract, it was not by the terms of that instrument necessarily to terminate when the indebtedness in question had become satisfied. On the contrary, the company, at its option, was entitled to keep possession of the mill and operate it for the term of five years from the date of the last writing, if it complied with its undertakings therein expressed. In this connection it is proper to refer to the 8th exception of law, which ought not to have been stricken. It appertains to the question of the company's alleged right to damages for what it claims was an unwarranted seizure of the property by Russell. As remarked above, the right of the company to the possession and control of the mill did not, under the terms of the contract, terminate upon the discharge of Russell's indebtedness to it; and this being so, if the company did not, by failing properly to perform its undertakings in the premises, commit a breach of that contract before Russell entered upon and resumed possession of the property, he was guilty of a trespass, and the company was entitled to recover damages therefor.

5. The auditor further found, as matters of fact, that the shingle-mill, as turned over to the company on November 20, 1895, was fully capable of cutting 80,000 first and second class shingles per day, and accordingly that there was no necessity to change the mill in order to carry out the contract that day made; that before April 1, 1897, the Russell notes had been paid off and discharged; and that $1.10 per thousand was the cost of making shingles of the grades specified at that mill. In connection with these finding of fact, he reached the following conclusions of law: that the company was bound to oper-

ate the mill in a prudent, economical, and businesslike manner, and was therefore bound to cut on an average 80,000 shingles per day, Sundays and legal holidays excepted, and to account for the same at the prices fixed by the written contract; that, for the purpose of carrying out this contract, it was authorized to make all necessary purchases and expenditures and charge the same to Russell, but that the company was not authorized, at his expense, to change the structure of the mill or to purchase new and expensive machinery not necessary for carrying out the contract. In making his calculations, the auditor refused to allow the company credit for the cost of adding the two stories to the mill and the cost of the new boiler and of other appliances which he deemed unnecessary to an efficient and successful operation of the plant. The 3d, 4th, and 6th exceptions of fact, and the 4th and 5th exceptions of law, present with sufficient distinctness the company's objections to the findings and conclusions of the auditor just enumerated, and ought not to have been stricken; but the legal conclusions were, practically and in substance, right, if the findings of fact were correct. The company was certainly bound to operate the mill prudently, economically, and in a businesslike manner. We do not think the terms of the written contract imperatively required it to produce an average of 80,000 shingles per day, excluding Sundays and legal holidays; but if that was the fair capacity of the mill, the company was bound to make the output come up to it. This is one of the controlling issues in the case.

The company, while authorized to make at Russell's expense all needed improvements and repairs upon the existing plant, was not at liberty to erect practically a new one or to add extraordinary and expensive machinery or appliances, such as the new boiler, and charge the same to Russell's account. It is one thing to keep a mill already built and equipped in good running order, and quite another to erect virtually a new one and furnish it with new machinery.

The auditor's finding that the notes had been paid off did not, of course, mean that they had been actually taken up by Russell, but that, allowing him proper credits for the products

of the mill, the same had been satisfied by operation of law. The correctness of this finding depends exclusively, and that as to the cost of making shingles largely, upon what was the real capacity of the mill when properly operated.

Below will be found a ruling that the 2d exception of fact did not properly attack the auditor's finding that there was no agreement in parol, effective after the company took charge of the mill, to reduce the price of shingles. This question is, however, properly raised by one of the exceptions now under consideration, and should be dealt with by the trial court, along with other matters hereinabove pointed out, at the next hearing.

6. The 2d exception of fact complains of the finding of the auditor to which we last referred, on the ground that there was no evidence to sustain it. The record shows clearly that there was testimony which, if true, not only supported but fully authorized this finding. This particular exception was therefore without merit, and striking the same did not operate to the injury of the company; but note what is said above concerning the matter to which this exception relates. The 5th exception of fact alleges error in a finding of the auditor that the purchase of certain chemical fire-extinguishers was unnecessary, and therefore the company had no right to charge Russell with the cost thereof. This exception was, perhaps, sufficient in form, but an examination of the record shows that the auditor's conclusion as to this particular matter was demanded. It follows that striking such exception, whether strictly correct practice or not, would not be cause for reversing the judgment. *Mason* v. *Commissioners*, supra.

In the 1st exception of law the point is made that the auditor erroneously found that there was usury in the notes given by Russell to the company. This exception was not well taken, for the language used by the auditor in the finding therein referred to does not bear the construction thus placed upon it. As matter of fact, the auditor's finding as to usury related exclusively to the debt on open account.

The 9th, 10th and 12th exceptions of law merely present loose and general objections to conclusions which the auditor evidently reached by making calculations upon statements of

fact embraced in the testimony and upon figures and amounts thereby disclosed. Nowhere in any of these exceptions is a single error in the calculations themselves, or in the data upon which they were based, pointed out. It was proper, therefore, for the court to strike these three exceptions on the ground that they were not sufficiently clear and distinct. The 11th exception of law deals with the same matter as the 5th exception of fact, of which we have already disposed.

7. There was no error in refusing to allow the amendments to the exceptions. In so far as the proposed amendments presented new questions or sought to make good exceptions totally without merit, it was entirely within the court's discretion to allow or reject them ; and the company had no right to invoke a favorable exercise of this discretion, for no reason or excuse for not presenting the exceptions in time and in proper form was given. To the extent that the amendments were amplificatory of valid exceptions already in, they were not needed. See *Lane* v. *Railway Co.*, 96 *Ga.* 630, and cases cited on page 644.

*Judgment reversed. All the Justices concurring.*